SCANNED

DATE: 3-29-04

BY: _____ CMG

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **JOHN JAIRO DIOSA-ORTIZ,**<br>**Petitioner,**<br><br>**v.**<br><br>**JOHN ASHCROFT, Attorney General;**<br>**TOM RIDGE, Secretary, DEPARTMENT**<br>**OF HOMELAND SECURITY; and MICHAEL J.**<br>**GARCIA, Acting Secretary, BRUCE**<br>**CHADBOURNE, Interim Field Office Director,**<br>**Boston District, BUREAU OF IMMIGRATION**<br>**AND CUSTOMS ENFORCEMENT;**<br><br>**Respondents** | **NO. 03-12510-PBS**<br><br>**PETITION FOR WRIT OF**<br>**HABEAS CORPUS,**<br>**COMPLAINT FOR**<br>**DECLARATORY AND**<br>**INJUNCTIVE RELIEF, and**<br>**MOTION FOR EMERGENCY**<br>**STAY OF DEPORTATION** |

**PETITIONER'S RESPONSE TO RESPONDENTS'**
**MOTION TO DISMISS HABEAS CORPUS PETITION**

Petitioner hereby submits this response to Respondents' motion to dismiss.

*Jurisdiction*

Respondents first posit that this Court lacks jurisdiction to entertain the petition.

Essentially, the Government argues that where the determination of a legal decision involves

review of the facts which underlie that decision, it is beyond the scope of habeas jurisdiction.

<u>See</u> "Respondents' Memorandum of Law In Support Of Motion To Dismiss Habeas Corpus Petition" (hereinafter "Govt. Memo") at 7-9. This position is patently ludicrous. Most, if not all, constitutional or legal challenges presented in a habeas petition will require a review of the facts which allegedly support the challenged decision. If review of such facts were outside the scope of habeas jurisdiction, it would simply cease to exist.

More importantly, the Government's position is belied by the very cases on which it relies for this rather remarkable proposition. It states that "it has been held that habeas review is not a vehicle for the Court to review and reverse ***the manner in which an Immigration Court's discretion was exercised*** by examining the evidence in the record supporting or undermining the alien's claim for discretionary relief." Govt. Memo at 8 (emphasis added). This, of course, is true, as far as it goes. Congress has explicitly eliminated federal jurisdiction to review decisions which are based on the pure exercise of an Immigration Judge's discretionary judgment. <u>See</u> Immigration and Nationality Act (INA) §242(a)(2)(B). The determination of whether an alien is entitled to that consideration, however, is an entirely different matter. Indeed, the case upon which the Government relies for the proposition that "where a 'fact-intensive review' of a legal determination 'demands an extensive factual entry' that therefore 'the Court does not possess habeas jurisdiction'", Govt. Memo at 8, specifically refutes its claim. In <u>Lopez v. Ashcroft</u>, 267 F.Supp. 2d 150 (D. Mass. 2003), the district court's finding that habeas jurisdiction did not lie (to review the BIA's denial of a motion to reopen) was predicated upon its conclusion that the decision on a motion to reopen "presents a question of discretion." <u>Id</u>. at 153. Furthermore, the court specifically held that Lopez did not "maintain that the Department refused to consider him for a certain form of statutory relief, which would confer jurisdiction under the reasoning in [<u>Saint Fort v. Ashcroft</u>]." <u>Id</u>. at 152.

This is precisely the issue in the case at bar. Mr. Diosa was precluded from having his §212(c) application considered as a result of the IJ's erroneous determination that he had abandoned his status as a lawful permanent resident, and was therefore statutorily ineligible for consideration of his §212(c) application. Thus, the issue in this case in no way deals with review of a discretionary decision; rather, it challenges the finding of ineligibility for such consideration.

St. Fort v. Ashcroft, 329 F.3d 191 (1st Cir. 2003), is dispositive of the issue of jurisdiction in this case. In St. Fort, the First Circuit reviewed the scope of habeas jurisdiction in the immigration context, both historically and in light of the amendments to the INA made by the Antiterrorism and Effective Death Penalty Act (AEDPA), and the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), both enacted in 1996. In determining that habeas jurisdiction exists for claims arising under the United Nations Convention Against Torture, the Court discussed the scope of 28 U.S.C. §2241 habeas jurisdiction:

> At a minimum, habeas review encompasses constitutional claims that are at least colorable. This includes an assessment of whether a particular set of facts amounts to a constitutional violation. Habeas also encompasses colorable claims that an alien's statutory rights have been violated. Included in this category are issues of proper construction of a statute, which is an issue of law. As a result, if a statute makes an alien eligible to be considered for a certain form of relief, he may raise on habeas the refusal of the agency to even consider him. But he may not challenge the agency's decision to exercise or not exercise its discretion to grant relief.
> 329 F.3d at 203 (citations omitted).

The plain language of St. Fort permits habeas review of exactly the claim raised in this case, as well as the facts surrounding the claim. Here, the IJ and BIA determined that Mr. Diosa abandoned his permanent resident status. As a result, he was found not to be a "returning permanent resident," as defined at INA §101(a)(20) and (a)(27)(A), and ineligible for an INA

§212(c) waiver of deportability. Clearly, the issue in this case involves the proper construction of these statutes. Whether Mr. Diosa is "eligible to be considered" for §212(c) relief is at the heart of his claim. If it is determined, as argued below, that the Immigration Judge (IJ) erroneously found that Mr. Diosa abandoned his permanent resident status, both the finding that he is inadmissible as a returning permanent resident, and the refusal to consider his §212(c) application, would constitute both an error of law, and a violation of due process. Under St. Fort, this Court clearly has jurisdiction to adjudicate this habeas petition.

## *Merits*

The gravamen of Mr. Diosa's petition is that he could not have abandoned his lawful permanent resident status, as he left only in reliance on the Government's erroneous notification to him that he had previously been ordered deported. The Immigration Judge and the BIA based their decisions on the belief that Mr. Diosa purposely avoided his ***deportation hearing***, and thus is himself to blame for any misunderstanding. See Oral Decision of the Immigration Judge, Habeas Petition Exhibit (hereinafter "H.P.Ex.") E[1] at 12-13; Decision of the Board of Immigration Appeals, H.P.Ex. H at 1-2. The Government defends here on the same ground. A careful review of the record, however, reveals that this finding is clearly erroneous. Factual findings of the BIA are reviewed in this Circuit by the substantial evidence standard; findings will be upheld if supported by "reasonable, substantial, and probative evidence on the record

---

[1] Citations to exhibits appended to the Petition for Writ of Habeas Corpus are designated "H.P.Ex. ___. Citations to exhibits appended to this Memorandum are designated "Memo Ex. ___."

considered as a whole." <u>Mendez v. INS</u>, 197 F.3d 6 (1st Cir. 1999); <u>Cordero-Trejo v. INS</u>, 40

F.3d 482 (1st Cir. 1994).

### Chronology

The relevant events in this case occurred as follows:

- July 4, 1981 – Mr. Diosa enters the United States as a lawful permanent resident.

- June 7, 1985 – Mr. Diosa is convicted of a controlled substance offense, and receives a three year sentence of imprisonment.

- September 20, 1985 – Mr. Diosa is placed in deportation proceedings through the issuance of an Order To Show Cause, served on him while serving his sentence at FCI Texarkana, Texas.

- December 12, 1986 – Mr. Diosa is admitted to immigration bond. The bond receipt required the obligor to present Mr. Diosa at the Immigration Court in El Paso, Texas "for hearing" at a time  "to be set  at a later date." See Memo Ex. A.

- February 25, 1987 – A deportation hearing is conducted in El Paso, Texas. Neither Mr. Diosa nor his attorney of record, John Ruginski, appear, as neither had received notice of the hearing. In a letter addressed to Mr. Ruginski dated that same day, the Immigration Court advised that the IJ "has ORDERED that your case(s) be administratively closed and be considered no longer pending before the Immigration Judge …. No further action will be taken until the Immigration Service has located the respondent(s) and the case is again presented for recalendaring and further proceedings." See Memo Ex. B. Apparently neither the notice of the hearing, or this correspondence, are mailed via certified mail; Mr. Ruginski does not receive either correspondence.

- March 9, 1987 – Mr. Diosa's bond obligor, Mary Vega, receives INS form I-340, "Notice to Deliver Alien." The form demands that Ms. Vega surrender Mr. Diosa to Service custody in El Paso ***for deportation***." See Memo Ex. C. Based upon this correspondence, Mr. Diosa; his wife; the obligor, Ms. Vega; and Attorney Ruginski believe that an order of deportation, rather than administrative closure, has issued.

- March 24, 1987 – In response to the receipt of the I-340, Attorney Ruginski files INS Form I-246, "Application for Stay of Deportation," with the INS. The application states that neither the obligor, Ms. Vega, nor he ever received notice of the February 25th deportation hearing; if he had, Mr. Diosa "would have attended the hearing, admitted the allegations, and submitted a Petition for §212(c) relief." See Memo Ex. D.

- March 24, 1987 – Attorney Ruginski calls the INS in El Paso. Handwritten notes of Deportation Office Rand H. Smith indicate that Mr. Ruginski informed the Service that he never received notice of the deportation hearing, and that he was preparing a motion to "vacate the I-340 order." Officer Rand advised Mr. Ruginski that the IJ no longer had jurisdiction of the case; to direct any such request to the INS District Director; and that Mr. Diosa remained subject to the I-340 surrender demand. Officer Rand's notes also reference a call from another Rhode Island attorney, Robert Watt, who would later succeed Mr. Ruginski as Mr. Diosa's attorney. Mr. Watt also maintained that Mr. Diosa had not received notice of the deportation hearing. Officer Rand's notes further reveal that Mr. Diosa's wife , Edith, also contacted the El Paso INS, to "ask for relief" for her husband. The notes state that Mrs. Diosa (who was still under the impression that her husband had been ordered deported, based on the I-340) offered to have her husband leave the country. Officer Rand responded that "that would be nice, but it would *not* automatically end our demand on obligor." See Memo Ex. E.

- March 29, 1987 – Under the mistaken impression, based upon the Service's I-340, that he was already under an order of deportation, and that if he appeared in El Paso he would be taken into custody and subjected to forced deportation, Mr. Diosa leaves the United States.

- April 17, 1987 – The INS issues its response to Attorney Ruginski's application for a stay of deportation. The response states that "Mr. Diosa's case was administratively closed by the Immigration Judge on February 25, 1987; therefore a Stay of Deportation is not necessary as he was not ordered deported." This is the first time that Attorney Ruginski learns that Mr. Diosa was never ordered deported; Mr. Diosa, however, has already self-deported. See Memo Ex. F.

- April 21, 1987 – Attorney Ruginski files an appeal of the breach of Mr. Diosa's bond. In his statement of reasons for the appeal, Mr. Ruginski again states that he did not receive notice of the deportation hearing, and explains for the first time, based on the INS response to his application for a stay of deportation, that he was misled by the I-340 to believe that Mr. Diosa had received an order of deportation. See Memo Ex. G.

- May, 1988 – Mr. Diosa re-enters the United States.

- 1993 – Mr. Diosa comes into contact with the INS during an investigation of another individual. As a result of this contact, Mr. Diosa discovers for the first time that his case was administratively closed, and that he was never ordered deported. He subsequently presents himself to Providence INS with successor Attorney Watt in an attempt to resolve his status.

- November 19, 1993 - The INS issues Mr. Diosa a new Order to Show Cause.

- August 11, 1997 – The BIA remands Mr. Diosa's case to the Immigration Court for a determination of Mr. Diosa's eligibility for §212(c) relief.

- April 10, 2002 – Determining that Mr. Diosa intentionally avoided his February 25 deportation hearing, the IJ rules Mr. Diosa ineligible for §212(c) relief, holding that he abandoned his permanent resident status when he returned to Colombia in 1987.

- October 9, 2003 – The BIA affirms the IJ's decision, similarly relying on its belief that Mr. Diosa had purposely failed to appear for his deportation hearing.

- December 15, 2003 – Mr. Diosa files the instant habeas petition.

### The Agency Decision is Based upon Plainly Erroneous Findings

The decisions of the IJ and BIA, and the Government's defense of them, all rely on the erroneous determination that Mr. Diosa knowingly and intentionally did not appear at his deportation hearing. See April 10, 2002 Oral Decision of the Immigration Judge (H.P.Ex. G) at 12 ("respondent in these proceedings testified that after consulting an attorney, he was told that if he appeared before the Immigration Judge he would all [sic] probability be deported and based on that advice, the respondent left the United States"); Decision of the Board of Immigration Appeals (H.P. Ex. H) at 1-2 ("we note that the respondent testified that he purposefully avoided his deportation proceedings ... because his attorney told him that he would likely be deported .... his misunderstanding regarding his status was due, in large part, to his refusal to present himself to the Immigration Court"); Govt. Memo at 11 ("despite Petitioner's attestation that his departure was the result of a misunderstanding caused by the INS, he admitted under cross-examination that, in fact, he left the United States because he wanted to evade deportation").

The sole source of this allegation is a snippet of testimony, taken out of context, from Mr. Diosa's July 11, 2001 deportation hearing:

IJ.    He told you to leave the United States because if you appeared before an Immigration Judge on the charge, that you would be deported.

A.    Exactly.

IJ.    And because he told you that, you decided before you were ordered deported to leave the United States, to avoid deportation, right?

A.    That's correct, your Honor.  Yes, that's exactly.
July 11, 2001 Tr. at 57-58 (Memo Ex. H).

This misstatement, which was elicited in the midst of examination by Judge Ragno that

can only be described as bullying, was clearly the product of Mr. Diosa's admitted confusion,

intimidation, and lack of fluency in English.  An examination of this entire portion of the

transcript is necessary to properly assess the testimony (all emphasis added):


Judge to Mr. Diosa-Ortiz

Q.    Sir in group Exhibit 3, in your record here, they put you under proceedings on September 20, 1985.  That's following your conviction in the United States District Court of the Southern District of Florida, right?

A.    Right.

Q.    And that was pursuant to your being convicted of conspiring to possess cocaine with intention to distribute, right?
A.    That's right.

Q.    Okay.  Did you appear before an Immigration Judge in connection with that order to show cause and notice of hearing, sir?

A.    No, sir.

Q.    No.  Well how did you end up getting a lawyer who told you that you had to report for deportation in San Antonio, Texas in 1987? Sir?

A.    Because he was the same lawyer that took my wife's case back then and my wife asked him to transfer my case to here to (indiscernible) Providence, Rhode Island. So that's how I find out from him.

Q.    Sir, according to group Exhibit 3 in the record, your attorney was sent a letter from the Immigration Service. Okay. February 25, 1987. It says here, your client failed to appear for a hearing at this office at this date. *The Immigration Judge ordered that your case be administratively closed and be considered no longer pending before the Immigration Judge. Are you aware of that, sir?*

A.    *I find out about that later in 1993 when I went into the Immigration (indiscernible). But I didn't think it happened.*

Q.    *Sir, your attorney didn't tell you that in 1987, that your case was administratively closed?*

A.    *No, sir.*

Q.    *Which means that you are not deported from the United States?*

A.    *No, sir. I never saw that one.*

Q.    *You didn't?*

A.    *I never saw that.*

Judge to Ms. Hiller

Q.    Do you have the original of that letter, Ms. Hiller, because the copy in group Exhibit 3 is illegible as far as what's written down below.

A.    Your Honor, the letter that you are referring to is the letter written by his attorney, that you're referring to, not the one –

Q.    Excuse me. This is by Mary Neto (phonic sp), EOYR [sic] clerk, in the court of El Paso, Texas.

A.    (indiscernible)


Judge For The Record

        Off the record.

(Off The Record)
(On The Record)

Judge To Mr. Diosa-Ortiz

Q.    While the Government's attorney is looking for that document, sir, were you suppose [sic] to report for a hearing before an Immigration Judge in El Paso, Texas?

A.    Yes. San Antonio.

Q.    And you didn't appear, right?

A.    I didn't appear, sir.

Q.    Why not?

A.    I was trying to appear here in Rhode Island and they didn't admit it.

Q.    What? What?

A.    *I was going to appear here in Rhode Island and I went through Mr. Bob, asking him to, if he could have me to transfer my case over here, but they didn't allow that.*

Q.    Did you apply for a change of venue in 1985, sir?

A.    I did it, but through Mr. Ruginski and the --

Q.    I said, did you apply for it and was it granted?

A.    I--

Q.    Change venue from court in El Paso to  Boston?

A.    That's what my lawyer back then, John Ruginski was suppose [sic] to do for me.

Q.    Sir, I'm not asking you what he's suppose [sic] to do for you.  I want to know if he did it.  Did he ask the court in El Paso to transfer or change your hearing from El Paso to the court in Boston?

A.    Apparently he didn't.

Q.    He didn't so if he didn't do that, you were suppose [sic] to appear at the court in El Paso on a certain date, right?

A.     Yes, sir, yes.

Q.     And you didn't do that?

A.     I didn't do that.

Q.     ***And could you tell me why you didn't do that?***

A.     ***I didn't cause if [sic] was not enough time and money***.

Q.     It wasn't because you didn't want to get deported that you didn't appear?  Is that the case, sir?

A.     I wanted to be represented and --

Q.     Sir, you were represented by Mr. Ruginski.  I'm saying you didn't go to the court in El Paso because you didn't want the judge to order you deported back then in 1985, because you already had been convicted for conspiracy to possess with intent to distribute cocaine in the U.S. District Court as the charging document alleges in group Exhibit 3 in the record.  ***Is that the reason you didn't go down to El Paso, Texas, because you didn't want to get deported?***

A.     ***Exactly, I think.  I didn't want to be deported, sir***.

Q.     All right.

Judge To Ms. Hiller

Q.     Ms. Hiller, did you get that original?

A.     Your Honor, one is dated February --

Q.     Twenty-five, 1980 --

A.     Not yet your Honor.  I found the original of another letter.  I haven't --

       (Off The Record)

       (On The Record)

Judge to Mr. Diosa-Ortiz

Q.     All right, sir, so you didn't want to get deported and your case is administratively closed.  Right?  So far you follow?

A.      Yes, your Honor.

Q.      *Okay. And that was February 25, 1987. And Mr. Ruginksi told you that you were deported from the United States? Is that right?*

A.      *That's what I understood back then.*

Q.      *No, sir, it's not what you understood.*
A.      *Yes.*

Q.      *Did Mr. Ruginski tell you that you were ordered deported from the United States?*

A.      *That I was deported--*

Q.      Excuse me. Can I finish the question before you answer it?

A.      Yes, your Honor.

Q.      Because I don't know how you answer a question without having heard it first. We haven't spoken before about this, have we?

A.      Yes, your Honor

Q.      So wait for the question to be asked before you answer. *Did Mr. Ruginski tell you, on no uncertain terms, that you had been ordered deported from the United States to Colombia by an Immigration Judge?*

A.      *Yes.*

Q.      *When did he tell you that?*

A.      *That was at the beginning of March of 1987.*

Q.      *And how did Mr. Ruginski tell you that you were ordered deported from the United States of America, by an Immigration Judge in a court in El Paso, Texas in March of 1987, if you didn't appear for a hearing before an Immigration Judge, and your case was administratively closed?*
A.      *You Honor, I'm confused here with the answer, again because he didn't exactly tell me that. He told me--*

Q.      *Mr. Ruginski never told you you were ordered deported because that never happened, did it?*

A.      *Exactly, Your Honor. I'm sorry, because I'm a little bit confused.*

Q.    He told you to leave the United States because if you appeared before an Immigration Judge on the charge, that you would be deported.

A.    Exactly.

Q.    And because he told you that, you decided before you were ordered deported to leave the United States, to avoid deportation, right?

A.    That's correct, your honor. Yes, that's exactly.

Q.    Okay.

A.    I'm sorry.

July 11, 2001 Tr. 52-58 (Mem. Ex. H).

Notwithstanding Judge Ragno's repeated attempt to put words into Mr. Diosa's mouth, a fair review of this testimony in its entirety makes it perfectly clear that the point Mr. Diosa was attempting to make was that he *purposely avoided presenting himself to El Paso in response to the demand for his surrender*, not, as the IJ, BIA, and Government would like to have it, *to avoid his deportation hearing*, of which he had previously made it perfectly clear that he did not have any notice of. In this exchange, Mr. Diosa first stated that he did not find out that the El Paso IJ had administratively closed his case, rather than order deportation, until sometime in 1993 when he presented himself to Providence Immigration. July 11, 2001 Tr. at 53 L.2-15 (See Memo Ex. H). Judge Ragno then asked Mr. Diosa why he did not appear for "a hearing before an Immigration Judge in El Paso." Id. at 54, l.6-12. Mr. Diosa's response is telling:

A.    I was trying to appear here in Rhode Island and they didn't admit it.

Q.    What?  What?

13

A.    I was going to appear here in Rhode Island and I went through Mr. Bob, asking him to, if he could have me to transfer my case over here, but they didn't allow that.

Id. at 54, l. 13-18.

It is clear that what Mr. Diosa was referring to was his surrender to the I-340 demand, not to his original hearing. "Mr. Bob" is Attorney Robert Watt, who intervened in the case the day before Mr. Diosa was to surrender to the demand, well after the February 15 deportation hearing date. This fact is confirmed by the independent documentary evidence in the record. Memo Exhibit C, for example, is a copy of the I-340 demand, upon which INS Officer Smith noted that he "discussed case with subject's new attorney; will hold to I-340 demand with 24 hour ext. of time." See Memo Ex. C. Similarly, in Memo Ex. E, Officer Smith noted that on March 23, at 4:30 p.m., "new attorney Robert Watt called," claiming that Mr. Diosa "had not known about hearing." See Memo Ex. E.

This crucial point is reinforced again moments later in the testimony:

Judge to Mr. Diosa-Ortiz:

Q.    All right, sir, so you didn't want to get deported and your case is administratively closed. Right? So far you follow?

A.    Yes, your Honor.

Q.    Okay. And that was February 25, 1987. And Mr. Ruginksi told you that you were deported from the United States? Is that right?

A.    That's what I understood back then.

Q.    No, sir, it's not what you understood.

A.    Yes.

Q.   Did Mr. Ruginski tell you that you were ordered deported from the United States?

A.   That I was deported—

July 11, 2001 Tr. at 56.

After repeatedly being told by Mr. Diosa that he thought he had been ordered deported, Judge Ragno finally elicited what he wanted to hear by putting the words into the mouth of an obviously confused Mr. Diosa:

Q.   ...Did Mr. Ruginski tell you, in no uncertain terms, that you had been ordered deported from the United States to Colombia by an Immigration Judge?

A.   Yes.

Q.   When did he tell you that?

A.   That was at the beginning of March of 1987.

Q.   And how did Mr. Ruginski tell you that you were ordered deported from the United States of America, by an Immigration Judge in a court in El Paso, Texas in March of 1987, if you didn't appear for a hearing before an Immigration Judge, and your case was administratively closed?

A.   You Honor, I'm confused here with the answer, again because he didn't exactly tell me that. He told me--

Q.   Mr. Ruginski never told you you were ordered deported because that never happened, did it?

A.   Exactly, Your Honor. I'm sorry, because I'm a little bit confused.

Id. at 57-58.

Fairly reviewed, this seven page excerpt reveals that Judge Ragno refused to accept Mr. Diosa's repeated credible testimony that he left the United States believing that he had already been deported, and elicited the purported "admission" only by pressuring Mr. Diosa into

confusing the two elements (his nonappearance at the February 25 deportation hearing with his nonappearance pursuant to the I-340 demand).

This view is supported not only by an objective reading of the entire excerpt, but by prior testimony and all the objective documentary evidence, as well. At a hearing as far back as 1994, Mr. Diosa testified that he left because he thought he was deported:

> Q.    All right. And when you left in March of 1987 to go to Columbia, what was the purpose of your—your reason to go to Colombia?
>
> A.    Because I thought I was to be deported, so I left voluntarily.

June 13, 1994 Tr. at 14 (Memo Ex. I ).

At another hearing the following year, Mr. Diosa repeated this testimony:

> Q.    Can you tell the Court why you came back using the name Jaime Rivera?
>
> A.    Because when I left the country in the first place, I thought I was deported.

June 23, 1995 Tr. at 28 (Memo Ex. J).

Finally, at the July 11, 2001, hearing before Judge Ragno, Mr. Diosa previously rendered the same testimony, prior to the "examination" by Judge Ragno.

> Ms. Hiller to Mr. Diosa
>
> Q.    Sir, when did you leave the United States?
>
> A.    Approximately the end of March 1987.
>
> Q.    Okay. And why did you leave the United States?
>
> A.    I was under the impression I was deported.

July 11, 2001 Tr. at 31 (Memo Ex. K).

Q.     Okay.  And this document, sir, says that you said that you left the United
States on March 29, 1997 believing you were self deporting yourself.  Is that
true?

A.     Yes. (indiscernible).

Q.     You intended to self deport yourself when you left the United States?

A.     I didn't intend to self deport myself.  I understood like that, I was already
deported.

Id. at 32.

This consistent testimony is supported by *all* the objective documentary evidence in the

record.  Attorney Ruginski repeatedly claimed, from the moment he became aware that a

deportation hearing had been conducted (from Ms. Vega's receipt of the I-340), that he had

never received notice of the February 25 deportation hearing.  All the actions he took — in

contacting the Service Officers in Texas; in attempting to obtain a stay of deportation; and in

appealing the bond breach — support both that he did not know of the hearing, and that he was

under the impression that Mr. Diosa had received an order of deportation.  See  Affidavit of John

Ruginski, Esq., Memo Ex. L.   Mrs. Diosa attempted to testify at the hearing consistent with this

version of the events but was precluded from doing so on the basis of evidentiary rulings which

can only be described as absurd.  See July 21, 2001 Tr. at 72-82 (Memo Ex. M);  Affidavit of

Edith Diosa, Memo Ex. N.  Indeed, the Service's own documentation supports this version of

events, as does all the evidence in the record.

Notably, the Government has never offered any evidence to demonstrate that Attorney

Ruginski, Mr. Diosa, or Ms. Vega actually received notice of the deportation proceedings. The

relevant administrative regulations then in effect required that service of the order to show cause

and notice of hearing "may be accomplished either by personal service or by routine service,

*however, when routine service is used and the respondent does not appear for the hearing or acknowledge in writing that he has received the order to show cause, it shall be re-served by personal service.*" 8 CFR §242.1(c) (emphasis added). Routine service is defined as "mailing a copy by ordinary mail addressed to a person at his last known address." See 8 CFR §103.5a(a)(1). Personal service, in turn, is defined as "(i) delivery of a copy personally; (ii) delivery of a copy at a person's dwelling house or usual place of abode by leaving it with some person of suitable age and discretion; (iii) delivery of a copy at the office of an attorney or other person, including a corporation, by leaving it with a person in charge; (iv) mailing a copy by certified or registered mail, return receipt requested, addressed to a person at his last known address." See 8 CFR §103.5(c)(1); Matter of Peugnet, 20 I&N Dec. 233 (BIA 1991) (definitions of "routine" and "personal" service provided at 8 CFR §103.5a(c) apply to deportation proceedings). In Matter of Huete, 20 I&N Dec. 250 (BIA 1991), the Board of Immigration Appeals held that in order to effect personal service of an Order to Show Cause and Notice of Hearing sent by certified mail, return receipt requested, the receipt must be signed by the addressee or a responsible person at his or her address and returned. In this case, no evidence has been adduced below which would suggest that the INS complied with its own regulations in providing proper notice to Mr. Diosa of his deportation hearing.

The evidence, in sum, reveals that Mr. Diosa never had notice of his original deportation hearing; was misled by the Government's I-340 to believe that he had been ordered deported in absentia; left the United States only in reliance on the Government's misinformation, in order to avoid being taken into custody and forcibly deported; and, most importantly, would never have departed the United States at all had he not been erroneously led to believe that he was under an order of deportation.

### Applicable Law Requires Reversal of
### The BIA Decision

Under INA §101(a)(20) the phrase "lawfully admitted for permanent residence" is defined as the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed. INA § 211(b) provides for an exception to the normal documentary requirements for admission to the United States for aliens returning from a temporary visit abroad who qualify as "returning permanent residents". See INA §101.(a)(27)(A); Matter of Quijencio, 15 I&N Dec. 95 (BIA 1975). Thus, an alien must be returning to an "unrelinquished" lawful residence after a "temporary" visit abroad.

In Rosenberg v. Fleuti, 374 U.S. 449 (1963), the United States Supreme Court held that an "innocent, casual, and brief excursion by a resident alien outside this country's borders may not have been 'intended' as a departure disruptive of his resident alien status and therefore may not subject him to the consequences of an 'entry' into the country on his return". Id. at 462. In determining whether a departure was interruptive of an alien's permanent resident status, the word "temporary" is not subject to inflexible definition, unvarying in application to all cases. Gamero v. INS, 367 F.2d 123, 126 (9th Cir. 1966). Under ordinary circumstances, the intention of the alien, when it can be determined, will control. Matter of Kane, 15 I&N Dec. 258, 262 (BIA 1975). In determining subjective intent, courts may ordinarily look to the alien's purpose in departing, the anticipated termination date of the trip abroad, and the alien's actual home or place of employment. Id. at 263.

It is well-settled, however, that "a possible justifiable reliance on a misstatement of a United States official, contributing to extended absence and failure to return, has been held to be

a factor that warrants exploration." <u>Kane</u>, 15 I&N Dec. at 263-64, citing <u>Tejada v. INS</u>, 346 F.2d

389 (9th Cir. 1965). In this case, Mr. Diosa **never** intended to leave the United States at all, and

did so solely on the basis of the Government's misstatement to him in its I-340 demand that he

surrender **"for deportation"**. In <u>Tejada</u>, the alien was erroneously informed by the American

Consul that he was ineligible to return to the United States. Relying on this misinformation, he

remained outside the United States for 16 years. After that period, he re-entered on a visitor's

visa and was subsequently ordered deported when he overstayed that visa. The Ninth Circuit

remanded the case for further findings "to determine if **any** set of facts would give rise to a

reversal of the deportation order." <u>Id</u>. at 393 (emphasis original). The Court stated:

> We hold that the petitioner would be eligible for relief under at
> least one set of findings, viz., if it is shown that he was actually
> and reasonably misled by the affirmative acts and misstatements of
> the American Consul. To hold to the contrary if this is in fact what
> transpired, and deny any form of relief from the order of
> deportation, would result in the punishment of a poorly-educated
> alien for his reliance on advice of a presumptively well-informed
> official of the United States government. This we would deem
> improper.
> <u>Id</u>.

The <u>Tejada</u> court relied in part on <u>McLeod v. Peterson</u>, 283 F.2d 180 (3rd Cir. 1960).

There, the petitioner was determined to be ineligible for suspension of deportation due to his

failure to meet the requirement of five years continuous presence in the United States. Petitioner

would otherwise have complied with the requirement, but had relied upon erroneous advice of

the Immigration and Naturalization Service, which resulted in his prior departure from the

United States. In reversing, the Third Circuit ignored the prior departure and held that he

complied with the five-year presence requirement, stating that "here we are not concerned with

whether the appellant was in fact absent but are presented with the question whether the

circumstances of his departure were such as to cause a break in his 'continuous' presence within the intendment of the statutory provision". Id. at 184.  The court further stated:

> It would seem that where it can be shown convincingly that fundamental errors h ave b een c ommitted i n p rior p roceedings o f the type here involved, and where a holding that the individual litigant was bound by the failures of his counsel or of the officials involved would result in a gross miscarriage of justice, such proceedings should be reopened and appropriate corrective measures taken.
> Id. at 184.

See also Moser v. United States, 341 U.S. 41 (1951) (Petitioner Swiss national applied for exemption from United States military service; Department of State arranged for revised application procedure which led petitioner to believe he would not thereby lose his rights to American citizenship; court holds that because of "misleading circumstances" of the case, Petitioner did not knowingly and intentionally waive right to citizenship); Podea v. Acheson, 179 F.2d 306 (2nd Cir. 1950) (American-born citizen who was (1) conscripted into Romanian army and (2) thereafter took oath of allegiance to King, only after American consular officials mistakenly informed him that he had lost his American citizenship, did not expatriate himself; both steps "were primarily caused by the erroneous advice of the State Department and were farthest from his real purpose").

In this case, Mr. Diosa's action in leaving the country was solely and directly attributable to the misinformation provided to him by the Immigration and Naturalization Service, and in full reliance upon it. Not only did they erroneously mislead him into believing that he had been deported, but apparently did so after failing to provide proper notice of his deportation hearing. He could not have voluntarily abandoned his residence under these circumstances. The decisions of the IJ and BIA rest on factual findings which are clearly erroneous, and their legal conclusion

21

that Mr. Diosa is statutorily ineligible for a §212(c) waiver because he abandoned his permanent resident status is erroneous as a matter of law. When an applicant for admission has a colorable claim to returning resident status, the burden is on the INS to show by *clear, unequivocal, and convincing evidence* that the applicant should be deprived of his lawful resident status. Matter of Huang, 19 I&N Dec. 749 (BIA 1988). This cannot be done under the circumstances of this case. The BIA decision must be reversed, and this matter remanded to permit Mr. Diosa to proceed on his §212(c) application.

Respectfully Submitted,
John Jairo Diosa-Ortiz
By His Attorney,

_____
Randy Olen, Esq.
55 Bradford Street, Suite 203
Providence, RI 02903
(401) 274-1400
(401) 274-2480 (fax)

## CERTIFICATION

I hereby certify that on the 29th day of March, 2004, I hand-delivered a true copy of the within *Motion* to Michael P. Sady, Assistant U.S. Attorney, John Joseph Moakley Courthouse, Suite 9200, 1 Courthouse Way, Boston, MA 02203, and Frank Crowley, Special Assistant U.S. Attorney, Department of Homeland Security, District Counsel, J.F.K .Federal Building, Room 425, Boston, MA 02203.

_____